Dewey MONDAY

v.

Anthony CELEBREZZE, Secretary of Health, Education and Welfare.

Civ. A. No. 4847.

United States District Court
E. D. Tennessee, N. D.

Aug. 3, 1965.

Earl E. Leming, James R. Weems, Knoxville, Tenn., for claimant.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., for the Government.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

On February (8), 1962, claimant Monday filed application for disability benefits alleging he became unable to work in June, 1961. He last met his earnings requirements on June 30, 1964. The Bureau disallowed his application and claimant requested a hearing stating:

"I have rock dust in my lungs and my doctor says the lungs are enlarged and that I am totally and permanently disabled. I have bleeding from my stomach."

After the hearing on January 14, 1963, the Examiner handed down a decision on April 30, 1963 holding that claimant had not sustained the burden of establishing that he had been continuously unable to engage in substantial gainful activity by reason of severity of impairments beginning on or before May, 1962 with indefinite duration. Thereafter, on August 20, 1963, the Appeals Council refused a Request for Review. On October 28, 1963, complaint was filed in this Court asking for a review under 42 U.S.C. Sec. 405(g). Before answer was filed, the Appeals Council vacated its denial of Review and this Court on December 26, 1963, on motion of the Secretary, entered an order remanding the case to the Secretary for further action.

A second hearing was had on April 28, 1964 and the decision cf the second Hearing Examiner was filed on May 6, 1964 in which he recommended that claimant be entitled to disability insurance benefits and a period of disability.

On review of his decision, the Appeals Council reached an opposite conclusion, finding that claimant was not disabled by any impairment of his gastrointestinal or musculoskeletal systems, that he had no significant pulmonary impairment and that though claimant had a psycho-neurotic reaction to his frustrating environment, it fell far short of the degree of mental impairment that can be reasonably deemed to be disabling. It further noted that under the regulations an individual will not be deemed under a disability if without injury to himself the mental impairment can be diminished to the extent he could engage in substantial gainful activity.

The cause is now before the Court for review of the Decision of the Appeals Council.

Claimant was born March 15, 1916. He had no schooling, although he learned to sign his name in the service. He can read numbers, but is unable to read road signs. He lives in a four room house with his wife and eight children. There are four acres of land around it but no garden, no use is made of it. The family has no income except a few dollars a week from the father-in-law, and commodities received about three years from Welfare. Since he became unable to work in June, 1961, claimant has done nothing, stays in the house most of the time, (can't carry coal for heating stove), walks to his mother's (400 yards) about twice a week, and no longer goes to a neighbor's house (half mile) to call a grocery store. He has no car. He does nothing around house, does not go to church, has few friends, just sits around house and goes to bed about 8:00 o'clock. He has trouble breathing and can't sleep. Coughs a lot and spits up blood, especially in winter.

He goes to Dr. Fox who prescribed four kinds of medicine. He has trouble getting medicine because he has no credit. He takes medicine for his lungs, stomach and bleeding from his bowels, but he claimed to get no help from it. His worst trouble is his breathing, but he also has a bleeding bowel which sometimes produces a pint of blood. This condition has persisted ten or twelve years. He seemed to think the blood originated in his stomach which produced knots in his side. He claimed also to have swollen fingers and kidney trouble. He also has a nervous condition. Things excite him. He testified he was hospitalized for lung bleeding when he was in the service, which was caused by a rifle going off against his chest. He had no difficulty performing his assignments in infantry except for the guns going off. He received a regular, not a medical, discharge.

He testified he quit work in June, 1961 because of disability but denied he quit because of a strike. He worked for a Mr. Gibson but never mentioned his illness because he would have been fired. He claimed not to know whether he applied for unemployment insurance after he stopped working although his wife interrupted to say she thought he did.

He first worked at 12 or 14 years of age. He was taken to a mine by his daddy and put in full days working. He got a regular job loading coal when he was eighteen. Loading coal was all he had ever done except a year and a half with a rock drill, and some shoring work. He worked twenty-six years. Except for a gap while he was in the service and a period around 1957, he worked steadily until June, 1961. His weight varied from 130 to 140 pounds. He was five feet six inches tall. He worked a 28 inch seam which went up to five or six feet, with an average of 36 inches. There is no work within 12 or 14 miles of his home except mining.

He first had trouble with blood in his stool about 12 years before he testified in 1964. Doctor Ausmus told him to quit and he was "cut out" of the mine for awhile in 1957 but went back and worked anyhow. He had about 15 shots for his stomach; but it didn't help him. He went back to work, said he had to work. He saw a Dr. Brown who didn't help and a Dr. O'Brian after he quit.

He is on a light diet, because of his stomach cramps, no heavy food. He has taken a coating medicine for his stomach since 1957.

His brother takes them to the grocery store in "the car," and lives about 400 yards from where "the car" is parked. He carries none of the groceries. He has a TV but doesn't watch it more than· a half hour in twenty-four. He watches the news only.

Mrs. Monday testified about his medicines. He does no work except carry a small bucket of coal now and then. She first noticed his disabilities in 1957. His breathing is hard and the children disturb him. They have no money except what relatives and friends give them. He doesn't take his medicine with regularity because there is no money to buy it.

She described the food contained in the commodity allowances each month, but said the kids would not eat the beans.

Mr. James P. Fort, Jr. testified as to job possibilities. He has had no experience around mines; but said Mr. Monday's limited experience and education would qualify him only for jobs in the lower labor classification. Within a 50 mile area of where claimant lived, he said job possibilities "would be very limited." They would be found primarily in the Knoxville or Johnson City-Bristol-Kingsport area, the first lying 60 miles away and the second about 70. He felt claimant's capacity for heavy physical labor was limited and from a practical standpoint it would be difficult to place him within a 50 mile radius of his home. On cross-examination, he limited even these possibilities to watchman or janitor.

A contact on April 11, 1962 found claimant very talkative with no difficulty in breathing, and no limitation on the use of his hands and legs. He can drive a car.

A contact report dated 3–2–64 by William B. Evans had this to say, among other things:

"The W/E lives in a small (4 room) unpainted, weatherbeaten house in a rural mountain area. There are two small rundown buildings near by. One serves as a barn for one (only one) cow and the other is supposed to be a smoke house. They have about a dozen chickens. There is no other livestock. They live in a hollow. The ground near-by is too steep to cultivate. I do not understand how they have *existed* much less lived. There is not enough land to cultivate a garden (that is less than 45°) and there was no evidence of one from last year."

\* \* \* \* \* \*

"Mr. Gibson stated the W/E was a coal loader while in his employ. He was an average worker. He was terminated *only* because a strike closed the mine and Mr. Gibson went out of business. He said the W/E never gave any indication of ill health. That he was absent some due to his wife's health, and due to lack of work at the mine but not for any other reasons. The W/E never complained. He worked in coal 36″ high on the average. Mr. Gibson stated that he considered the W/E's duties as average labor (not excessively strenuous). The W/E never received any benefits (sick or accident) as there was never any reason for same."

Doctor Joseph Fox of Jellico made a report to the Bureau of Old-Age and Survivors Insurance on February 20, 1962. His diagnosis was: "1. Chronic Peptic Ulcer and Hemorrhagic episodes 2. Pneumosilicosis—moderate 3. Anxiety Neurosis."

On May 24, 1962, Dr. W. M. Law of the Acuff Clinic reported to the Division of Vocational Rehabilitation:

"X-ray examination of the chest showed no abnormalities. Films of the upper gastro-intestinal tract were normal. A barium anema showed no significant abnormalities.

"Sigmoidoscopic examination carried out to 15 cm., showed no significant abnormalities.

"An electrocardiogram showed slight non-specific ST changes.

"Pulmonary function studies were within the limits of normal.

"The general physical examination showed no abnormalities.

"Although his primary trouble relates to the chest, the x-ray and pulmonary function studies did not reveal any evidence of serious trouble. The chest pain that he described did not seem to be anginal in type. His symptoms were suggestive of peptic ulceration, but there was no evidence of chronic scarring or of acute ulceration. He over smokes for a person with chronic bronchitis and I suspect would be helped by cutting out tobacco.

"The rectal bleeding is most likely due to some intermittent, superficial lacerations at the mucocutaneous junction.

Final Diagnosis: 1. Chronic bronchitis

2. Irritable bowel syndrome"

On May 15, 1962, Dr. George C. Gee, a neuropsychiatrist, reported to the same Division:

"The mental status examination reveals a well developed, well nourished white male who is fairly cleanly dressed wearing a white shirt. He complains that he has lost his hair twice in the last two or three years because of his nervous condition. Three or four years ago he would expectorate blood after coughing and he thought it was from his lungs. He began having headaches in 1957 and smoking would make him feel that his insides were knotting up, he felt anxious, had anxiety, smothering in his chest, and now cannot walk without shortness of breath. He states that he has had internal bleeding ulcers since 1957 and that this had made him more emotionally upset. Says he has been on a diet for his ulcer condition for six or seven years and receives medication for this. In February, 1962 Dr. Fox, Jellico, Tennessee found dust on his lungs and warned him never to return to the mines. The patient still has bloody stools. He has difficulty breathing and at night sometimes has to almost sit up to sleep. He always wakes up by daylight which is a habit of many years. He maintains a steady weight of about 142 pounds. He does wish to be independent and is outwardly hostile because of the rejection of his application for a welfare grant. He says he still hears warnings of blasting in the mines but this is decreasing and is apparently not of hallucinatory proportions. He has no convulsions but does feel dizzy and almost blacksout when he stoops over for the last five or six years. He has had several fractures while working in the mines but never received a head injury and has had no febrile illnesses.

"This is a well oriented man who seems to have a memory and resource of information which would be above that expected considering his education. He has a Psychoneurotic Reaction aggravated in the Involutional Period and his only productivity in the past 18 months was three weeks in June, 1961. He is tending to lapse into invalidism and dependency and the only chance of restoring him to productivity would be a period of intensive treatment to include both medical and psychiatric help such as could be afforded at VA Hospital, Johnson City, Tennessee. He is a veteran entitled to hospitalization and at 46 years of age he should have vigorous effort at treatment and might need an operation for his ulcers in view of the repeated hemorrhages. He might be referred to vocational rehabilitation after a period of hospitalization. He is certainly bright enough although he cannot read or write which would be a limiting factor in any rehabilitation program. He is quite discouraged because he applied for a welfare grant

and was turned down, but if he entered VA Hospital his family would be eligble (sic) for ADC it seems."

"My diagnosis is: 1. Chronic Peptic Ulcer with hemorrhagic episodes.
2. Pneumosilicosis, moderate to severe.
3. Anxiety neurosis-marked."

On November 16, 1962, Dr. Joseph Fox in a "To Whom It May Concern" letter diagnosed claimant's ailments as:

———◆———

Doctor P. J. O'Brian wrote on January 9, 1963:

"X-rays done January 8, 1963, at LaFollette Community Hosp. reveal some increase in broncho vascular markings in both lungs, and slight increase in hilar marking consistent with pneumoconiosis (mild). Stomach and duodenal x-rays reveal 'diverticulum of 2nd portion of duodenum.'"

His technical report on the previous day gave a little more information:

"Chest: There is slightly increased prominence of the bronchovascular markings throughout both lungs with slightly increased hilar shadows. These changes are consistent with a mild degree of pneumonoconosis (sic) but this is not definite. No localized areas of infiltration are demonstrated. The heart is not enlarged.

"Summary: Essentially normal chest.

"G. I. Series: G. I. series demonstrates a normal esophagus and stomach. The duodenal cap is well filled and appears normal. There is a small diverticulum measuring several milimeters (sic) in diameter, arising from the second portion of the duodenum. The remainder of the duodenum and proximal small bowel appears normal. No other changes observed."

Doctor Fox wrote another "To Whom It May Concern" letter on October 16, 1963. Excerpts follow:

"1. Chronic peptic ulcer with hemorrhagic episodes.

"2. Pneumosilicosis bilaterally moderate and symptomatic.

"3. Severe anxiety neurosis.

"Symptoms at that time were pain in the stomach with frequent bouts of vomiting and passing of blood bright red, with bowel movements, acute and severe nervousness. He had been on medications for quite some time with poor response and I did not note any improvement expecting the conditions to be chronic, progressive and downhill. At that time I made the statement that he had shortness of breath on exertion, some type of dysnea (sic), no angina or edema however. He had occasional wheezes, rales throughout both lungs. It was my final statement that he was totally and permanently disabled from gainful activity of any type particularly in view of his education and skill. Again in November, the sixteenth day of 1962 I issued another statement concerning Mr. Monday, physical condition at that time was again certain that his physical impairment began back in 1957 with the episodes of hemorrhagic peptic ulcer attacks and increasing pain in the abdomen and increase of pain in the capacity of breathing due to his lung condition. Again my diagnosis was the same.

"1. Chronic peptic ulcer with hemorrhagic episodes.

"2. Pneumosilicosis moderate to severe and symptomatic.

"3. Severe marked anxiety neurosis."

\*    \*    \*    \*    \*    \*

"I am writing this one last appeal in summary of Mr. Monday's progress which has been downhill, in one last hope of securing the necessary assistance which this man does deserve so that he may support his needy, rather large family.

"It is my professional opinion without bias that this man is totally and permanently one hundred per cent disabled from gainful activity of any type."

On March 9, 1964, Dr. Morgan reported to Dr. Collmann in connection with an examination at the University Hospital:

*"FINAL IMPRESSION:*

"1. Possible mild low-grade prostatitis.

"2. No surgical disease of the urinary tract.

"3. Anatomically and physiologically normal kidneys and ureters.

"This patient has no definitive disease process at this time and may have had no previous difficulty; however, the history does suggest the possibility of some mild prostatitis which has been recurrent in nature. There is no need for further investigation at this time, and there is no finding of the genito-urinary system that would interfere with any physical activity in which he might otherwise participate."

Doctor Obenour's report on the following day on his lungs follows:

" \*   \*   \* As you can see from the report of the pulmonary functions my conclusion is that he does not have significant physiologic impairment of pulmonary function. I further do not feel that there is sufficient evidence to make a diagnosis of pneumoconiosis. \*   \*   \* "

Doctor Collmann's summation to the Division on March 17, 1964 follows:

"Discussion: At the present time this man does have an active duodenal ulcer with, however, his mental approach will probably be somewhat difficult to manage. At least it is an uncomplicated ulcer, and he shows no evidence of having had any recent bleeding, obstruction, etc. from this. His careful work ups urologically and from a pulmonary function standpoint are self-explanatory and sufficient data is present to make decisions by any observer adversed in the field. Therefore, at the present time there is very little objective information that would show a major restriction in activity. I might say that this man was most cooperative during his hospitalization and every attempt was made to keep him comfortable, and I think he was well satisfied with the investigation. Every attempt has been made to approach this completely objectively, and I trust that the information obtained will be presented in that light."

Doctor Collmann's discharge sheet from the University Hospital summarized:

"Final Diagnosis: Active duodenal ulcer

Benign prostatic hypertrophy, minimal

Chronic bronchitis
Essentially normal pulmonary function"

A report by Dr. A. J. Muller a Roentgenologist, on 2–6–62 showed:

"Chest Examination: The cage is fairly symmetrical. The trachea is in midline. The diaphragmatic leafs are regular. The costophrenic angles are clear. The heart and great vessels are normal as to size and configuration. There are faint hilar calcifications. There is no active pulmonary tuberculosis or other recent pathology."

\*    \*    \*    \*    \*    \*

"Film study over the esophagus shows nothing remarkable. The gastric rugae are not unlike a hypertrophic gastritis. The duodenal bulb is irritable but regular. The second and third portions of the duodenum reveal

a normal sweep and the upper small bowel pattern visualized shows nothing significant.

"Belayed film study shown hypermotility.

"Summary:

1) Hyperactive irritable G. I. tract.

2) Hypertrophic gastritis.

3) No ulceration or malignacy."

On September 26, 1962, Dr. A. B. Harwell, Medical Consultant, in response to an inquiry from Dr. Joseph Fox as to the reasons for disallowing claimant's total disability, wrote in part as follows:

" 'Laboratory studies were as follows: Hemoglobin 14.8 WBC 9,200 with a normal differential. Urinalysis entirely negative with a sp gr of 1,022, serology non-reactive.

X-ray examination of the chest showed no abnormalities.

Films of the upper gastro-intestinal tract were normal.

A barium enema showed no significant abnormalities. Sigmoidoscopic examination carried out to 15 cm., showed no significant abnormalities.

An electrocardiogram showed slight non-specific ST changes.

The general physical examination showed no abnormalities.

Although his primary trouble relates to the chest, the X-ray and pulmonary function studies did not reveal any evidence of serious trouble. The chest pain that he described did not seem to be anginal in type. His symptoms were suggestive of peptic ulceration. He over-smokes for a person with chronic bronchitis and I suspect would be helped by cutting out tobacco.'

'The rectal bleeding is most likely due to some intermittent, superficial lacerations at the mucocutaneous junction.'

We also have in our folder the results of a psychiatric examination which reveals his condition to be related mainly to anxiety and dependency.

I point these matters out to you since it is our feeling that granting aid to him in these circumstances would foster further dependency and should not be done."

An indication of claimant's attitude is found in a paragraph of a report of Tennessee Department of Public Welfare Aid to Dependent Children:

"Applicant is a very bitter person and feels that everybody is against him. He says he was examined by Dr. Joseph Fox and for years was under the care of Dr. Ausmus, now deceased; but says he has also been treated by Dr. Charles Prater. He states that he was X-rayed at Jellico 10 or 12 years ago. He was X-rayed at Bethany Hospital recently and was called to Knoxville by Social Security where he was examined at Acuff Clinic. He says he was examined by 6 doctors but really didn't know what the report was. He states that he believes in working but that he is through because the doctors have said he will never be able to work in the mines again. He started working in the mines when about 12 years old, he went in with father but was not given a job until he was 19. He says he likes mine work and would continue if possible."

The Government placed in evidence a lengthy and detailed report of the Division of Vocational Rehabilitation upon which its decision denying him relief was based. This report reflects a controversy between claimant and the Division as to whether he owned a car. If he owned one, he would not be entitled to aid and the rejection was based in part on the Division's conclusion that he did own one.

A County Welfare Worker on 11–12–63 summarized his impressions of claimant as follows:

"Mr. Monday is a very bitter man. He and his wife have even threatened

the previous worker who visited their home. He was very nice to this worker but it could easily be seen that he is very bitter because he cannot be approved for ADC or disable social security. Worker feels that this man thinks he is in much worse condition than he actually is. I doubt if he will ever want to be self supported again."

Apart from the medical evidence, the Court has reservations about this case. The controversy about the car has no direct bearing on whether claimant was medically disabled, although it could have a bearing upon his good faith. At the first hearing, Mrs. Monday shielded claimant against testifying because it was claimed he spit up blood driving over, but claimant made a number of spirited interruptions and ended up by testifying himself. The Court cannot understand the failure of the Campbell County Welfare Department to allow welfare benefits with the eight small children in the family or the ill-feelings which permeate the evidence.

But the Court cannot decide the case upon these penumbral overtones. The question it must decide is whether claimant has proved medically determinable physical or mental impairments sufficient to preclude him from engaging in substantial gainful activity. The Court is strongly of the impression that the evidence shows no physical impairments which would affect claimant's ability to work. The evidence points rather to an anxiety rooting in changes in the coal industry and in his concern for his large family rather than to disabling mental or physical impairments. Dr. Gee felt that it would be helpful to him to go for intensive treatment both medical and psychiatric at a VA Hospital.

In any event the Court is of the opinion that there is ample evidence to support the Decision of the Appeals Council. The motion of the Government for a summary judgment is granted, and that of claimant denied.